## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MATTHEW FITZGERALD BREWER,      )
                                )
                    Plaintiff,  )
                                )
          v.                    )          1:22CV166
                                )
KILOLO KIJAKAZI,                )
Acting Commissioner of Social   )
Security,                       )
                                )
                    Defendant.  )

## <u>MEMORANDUM OPINION AND RECOMMENDATION</u>
## <u>OF UNITED STATES MAGISTRATE JUDGE</u>

Plaintiff, Matthew Fitzgerald Brewer, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket Entry 2.) Defendant has filed the certified administrative record (Docket Entry 8 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 11, 13; <u>see also</u> Docket Entry 12 (Plaintiff's Memorandum); Docket Entry 14 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

# I. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI (Tr. 203-15), alleging a disability onset date of October 1, 2019 (see Tr. 206). Upon denial of those applications initially (Tr. 75-90, 113-17) and on reconsideration (Tr. 91-112, 123-40), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 141-42). Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 45-74.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 12-30.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-7, 201-02, 314-19), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] meets the insured status requirements of the [] Act through September 30, 2024.
>
> 2. [Plaintiff] has not engaged in substantial gainful activity since October 1, 2019, the alleged onset date.
>
> 3. [Plaintiff] has the following severe impairments: degenerative joint disease, gout, hypertension, tendonitis, [and] obesity.
>
> . . .
>
> 4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
>
> . . .

2

5.  . . . [Plaintiff] has the residual functional
capacity to perform light work . . . such that he can
lift and carry 20 pounds occasionally and 10 pounds
frequently, and can sit, stand or walk for up to 6 hours
each.  He can also frequently reach, handle, finger and
feel bilaterally but can only occasionally reach
overhead.  He can frequently use ramps and stairs,
balance, stoop, kneel and crouch.  He can have no
exposure to unprotected heights, dangerous machinery, or
ladders, ropes, and scaffolds, and no exposure to extreme
heat and cold.

. . .

6.  [Plaintiff] is unable to perform any past relevant
work.

. . .

10. Considering [Plaintiff]'s age, education, work
experience, and residual functional capacity, there are
jobs that exist in significant numbers in the national
economy that [he] can perform.

. . .

11. [Plaintiff] has not been under a disability, as
defined in the [] Act, from October 1, 2019, through the
date of this decision.

(Tr. 18-30 (bold font and internal parenthetical citations
omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security
Commissioner's denial of social security benefits."  Hines v.
Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope
of [the Court's] review of [such a] decision . . . is extremely
limited."  Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).

3

Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence

4

allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[1] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's]

---

[1] The Act "comprises two disability benefits programs. [DIB] provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

5

medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[2] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and

---

[2]  "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

6

two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[4]

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

[4] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of
(continued...)

7

## **B. Assignment of Error**

In Plaintiff's sole issue on review, he asserts that "[t]he ALJ's failure to conduct a proper function-by-function analysis of [Plaintiff]'s gout and related symptoms as well as [the ALJ's] failure to provide a logical bridge between the evidence in the record, his conclusions and his RFC findings prevents the ALJ's conclusions from being supported by substantial evidence" (Docket Entry 12 at 5 (bold font and single-spacing omitted)), in violation of Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015), and Social Security Ruling 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184 (July 2, 1996) ("SSR 98-6p") (see Docket Entry 12 at 7-8). According to Plaintiff, "[t]he evidence of record reflects that [he] has an extensive history of gout that presents in multiple joints but primarily in his toes, ankles, knees and wrists." (Id. at 6; see also id. at 6-7 (detailing gout-related evidence Plaintiff believes supports greater limitations in RFC (citing Tr. 226, 308, 385, 405, 408, 412-13, 418, 420, 423-24, 565, 612, 722, 737)).) Plaintiff notes that, although the ALJ "summarized [Plaintiff]'s testimony regarding his gout and they [sic] symptoms and limitation [sic] he experienced secondary to his

---

[4] (...continued)
the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

gout" (id. at 5), the ALJ "failed to adopt limitations that specifically account for [Plaintiff's] gout in the RFC" (id. at 7 (citing Tr. 21-22)), including "limitations accounting for the use of crutches for standing and walking during a flare, the difficulty using his hands and arms during a flare involving his upper extremities and/or unscheduled breaks and absenteeism" (id.). Plaintiff deems the ALJ's errors "harmful" (id. at 13), because "[t]he VE clearly testified that the use of crutches 2-3 days a month for work activities involving standing and walking[,] . . . a restriction to occasional bilateral reaching, handling, fingering and feeling[,] . . . [and] expected absenteeism 2-3 days a month would preclude competitive work" (id. (citing Tr. 71-72)). Those contentions lack merit.

RFC measures the most a claimant can do despite any physical and mental limitations. Hines, 453 F.3d at 562; 20 C.F.R. §§ 404.1545(a), 416.945(a). An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms, including pain. See Hines, 453 F.3d at 562–63; 20 C.F.R. §§ 404.1545(b), 416.945(b). The ALJ then must match the claimant's exertional abilities to an appropriate level of work (i.e., sedentary, light, medium, heavy, or very heavy). See 20 C.F.R. §§ 404.1567, 416.967. Any non-exertional limitations may further

9

restrict a claimant's ability to perform jobs within an exertional level.  See 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

An ALJ need not discuss every piece of evidence in making an RFC determination.  See Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014).  However, "the ALJ must both identify evidence that supports his [or her] conclusion and build an accurate and logical bridge from that evidence to [that] conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted).  As to the role of the function-by-function analysis in that determination, the relevant administrative ruling states: "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. . . .  Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184, at *1.

The United States Court of Appeals for the Fourth Circuit has addressed this administrative ruling and the issue of whether an ALJ's failure to articulate a function-by-function analysis necessitates remand.  See Mascio, 780 F.3d at 636–37. Specifically, it stated "that a per se rule is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are irrelevant or uncontested," id. at 636,

but that "'remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review,'" id. (internal brackets and ellipsis omitted) (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). Here, the ALJ did not expressly assess Plaintiff's work-related abilities on a function-by-function basis (see Tr. 22-28); however, no basis for remand exists, because the ALJ's decision nevertheless supplies the necessary "accurate and logical bridge," Woods, 888 F.3d at 694 (internal quotation marks omitted), between the evidence and his findings that Plaintiff's gout (A) qualified as a severe impairment (see Tr. 18), but (B) did not result in greater limitations than those reflected in the RFC (see Tr. 21-22).

    As a threshold matter, Plaintiff's argument that "the ALJ's purported reliance on a lack of objective or severe abnormal physical findings . . . [wa]s misplaced and erroneous" (Docket Entry 12 at 11), because, "under the guidance in 20 C.F.R. § 416.929(c) and [Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304 (Oct. 25, 2017) ('SSR 16-3p')], [Plaintiff wa]s entitled to rely on subjective evidence to prove the severity of his symptoms" (Docket Entry 12 at 11 (italics omitted)), misses the mark. Neither Section 416.929(c) nor SSR 16-3p prohibits an ALJ from relying on

11

objective evidence as <u>one part</u> of the analysis of a claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms.  Indeed, Section 416.929(c) directs ALJs to consider a claimant's medical history, <u>medical signs and laboratory findings</u>, daily activities, testimony about nature and location of pain, medication and other treatment used to alleviate pain, along with medical opinions from examining and non-examining sources in evaluating a claimant's subjective symptom reporting.  <u>See</u> 20 C.F.R. § 416.929(c); <u>see also</u> 42 U.S.C. § 423(d)(5)(A) ("Objective medical evidence of pain . . . established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) <u>must</u> be considered in reaching a conclusion as to whether [an] individual is under a disability." (emphasis added)).

Coordinately, SSR 16-3p states as follows regarding the role of objective medical evidence in evaluating the intensity, persistence, and limiting effects of symptoms:

> Symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques.  However, <u>objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities</u> . . . .   [An ALJ] <u>must</u> consider whether a[ claimant]'s statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record.
>
> <u>The intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence</u>.  Examples such as reduced joint motion, muscle spasm, sensory deficit, and motor disruption

> illustrate findings that may result from, or be
> associated with, the symptom of pain. . . . .
>
> [An ALJ] will not disregard a[ claimant]'s statements
> about the intensity, persistence, and limiting effects of
> symptoms <u>solely</u> because the objective medical evidence
> does not substantiate the degree of impairment-related
> symptoms alleged by the [claimant]. A report of minimal
> or negative findings or inconsistencies in the objective
> medical evidence is <u>one of the many factors</u> [an ALJ] <u>must</u>
> consider in evaluating the intensity, persistence, and
> limiting effects of a[ claimant]'s symptoms.

SSR 16-3p, 2017 WL 5180304, at *5 (emphasis added) (footnote

omitted).

Here, in compliance with Section 416.929 and SSR 16-3p, the

ALJ relied on objective medical evidence as just <u>one part</u> of his

analysis of Plaintiff's subjective symptom reporting. (<u>See</u> Tr. 22-

28.) The ALJ also considered Plaintiff's ability to engage in

daily activities (<u>see</u> Tr. 23, 28), the nature and extent of his

treatment (<u>see</u> Tr. 23-28), and the opinion evidence (<u>see</u> Tr. 27-

28). Plaintiff simply has not shown that the ALJ's consideration

of objective evidence of Plaintiff's gout, as <u>one part</u> of the ALJ's

evaluation of Plaintiff's subjective symptom reporting, violated

Section 404.1529 or SSR 16-3p.

Turning to Plaintiff's assertions regarding the function-by-

function analysis, those assertions fall short because the ALJ's

evaluation of Plaintiff's subjective symptom reporting explains the

manipulative limitations and the absence of allowances for crutches

and absenteeism in the RFC. In that regard, the ALJ explicitly

acknowledged Plaintiff's statements that "[h]e periodically has

13

gout flare-ups that can last anywhere from one to three months and render him completely incapacit[ated]" (Tr. 22 (referencing Tr. 265, 286)), that his gout limits his ability to engage in "prolonged standing, reaching, . . . and using his hands" (id. (referencing Tr. 273)), that "gout in his left toe . . . [or] his right knee [] makes him unable to walk without assistance" (Tr. 23 (referencing Tr. 58)), that "[h]e uses crutches at least once every two weeks" (id. (referencing Tr. 64)), and that "[h]e cannot use his hands at all . . . [or] carry anything during a gout flare-up" (id. (referencing Tr. 66)). The ALJ, however, also found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record." (Id.)

The ALJ supported that finding with the following analysis:

As for [Plaintiff]'s statements about the intensity, persistence, and limiting effects of his . . . symptoms, they are inconsistent with the medical evidence of record, which reflects a routine and conservative treatment history, and generally benign physical examinations. He also reported shopping in stores monthly and driving as well as taking care of his son with assistance from his wife. . . . [T]here is no objective evidence of a documented medical need for a walker, . . . or bilateral canes. There is also no evidence of a documented need for a one-handed, hand-held assistive device. [Plaintiff] was given a new prescription for longer crutches on December 2, 2020. However, there is no evidence of the original prescription. In any case, that is also the only instance that crutch(es) have been mentioned at treatment visits since the alleged onset date. [Plaintiff] has not reported the use of crutches to a treatment provider nor has he been observed as using them at a treatment visit.

14

> He once had an antalgic gait in January 2020, but he
> ambulated without assistance.
>
> . . .
>
> [T]he [ALJ] finds . . . the [ RFC] assessment[ ] is
> supported by the medical evidence of record that notes,
> even during flare-ups, [Plaintiff] has very mild swelling
> and almost always with normal range of motion. [He] is
> also noted to be independent in activities of daily
> living. He also drives, plays basketball, mows his yard,
> and plays with his children. He does have some
> exacerbation after more vigorous activity but again, his
> treatment is conservative and he is not always or even
> regularly consistent with his medications.

(Tr. 23-28 (internal parenthetical citations omitted).) Plaintiff

attacks that analysis on three grounds, none of which carries the

day.

First, Plaintiff deems "[t]he ALJ['s] references [to

Plaintiff]'s 'generally benign exams and conservative treatment' or

his 'very mild swelling and almost always normal range of motion

during flare-ups' . . . misplaced" (Docket Entry 12 at 9 (quoting

Tr. 28)), because Plaintiff "testified that he use[d] medication,

rest and elevation to treat the majority of his gout flares at

home[,] as the course of treatment he would receive from his

treatment providers [wa]s the same as the medication he c[ould]

administer at home" (id. (citing Tr. 62-63)), "avoid[ed] foods that

trigger[ed] gout flares[,] and limit[ed] his daily activities or

avoid[ed] certain activities in an effort to reduce the frequency

and severity of his gout flares" (id. at 10 (citing Tr. 61-64)).

Plaintiff additionally points out that "no indication [exists] in

the records that [he] has been recommended non-conservative treatment options, or even a discussion of what those options would be for a condition like gout." (Id. at 9.)

As an initial matter, Plaintiff's contentions that he primarily treated his gout symptoms on his own, and that no provider of record recommended non-conservative treatment measures for gout (see id. at 9-10) does not provide the Court with any basis for faulting the ALJ's reliance on "generally benign exams" and/or "very mild swelling and almost always normal range of motion" to discount Plaintiff's subjective reports of disabling gout symptoms (Tr. 28). As discussed above, the ALJ could consider the objective evidence relating to Plaintiff's gout as one part of the analysis of Plaintiff's subjective symptom reporting. See SSR 16-3p, 2017 WL 5180304, at *5.

Moreover, with regard to conservative treatment, the ALJ correctly noted that, although an orthopedist "advised [Plaintiff to obtain] a rheumatology consultation for more aggressive attention to management of his gout," the record did "no[t] indicat[e] that he ever went to see a rheumatologist." (Tr. 25 (emphasis added) (referencing Tr. 395).)[5] Furthermore, Plaintiff's

---

[5] Plaintiff argues that "records tend to indicate that [he] was 'pending rheumatological referral' so it is not clear if an appointment was scheduled." (Docket Entry 12 at 10 (purporting to quote Tr. 418).) That argument lacks merit because, if Plaintiff in fact attended a rheumatology appointment following his June 2020 referral, then he should have identified the rheumatologist in his Disability Report - Appeal and ensured that the record contained a copy of the corresponding treatment record. Moreover, a treatment note dated December 2, 2020, indicates that the rheumatology "[a]ppointment was not made." (Tr. 615.)

16

primary care provider ("PCP") beginning in April 2021, Crystal A. Bates, FNP ("Nurse Bates"), did not support the idea of Plaintiff "treat[ing] the majority of his gout flares at home" (Docket Entry 12 at 9), and "instructed [him] to seek medical attention for gout flares" after he "asked for [a h]ydrocodone [prescription] to have available when he ha[d] gout flares" and "report[ed] that in the past his prior PCP would prescribe [hydrocodone] to use as needed for gout" (Tr. 722; see also Tr. 405 (previous PCP advising Plaintiff to call office for steroid taper if he had gout flare)). Plaintiff has thus not shown that the ALJ erred in considering largely normal examination findings and Plaintiff's conservative gout treatment in evaluating the intensity, persistence, and limiting effects of Plaintiff's gout symptoms.

Second, Plaintiff asserts that, "contrary to the ALJ's conclusions that there is no evidence of [Plaintiff]'s use of crutches prior to his 2020 prescription" (Docket Entry 12 at 10 (emphasis supplied by Plaintiff) (referencing Tr. 23)), Plaintiff submitted a statement from a former employer which "indicate[d] that [Plaintiff] was 'unable to walk without the aid of crutches for several months' due to a gout flare" (id. (quoting Tr. 226)). Plaintiff additionally faults the ALJ for finding "the 2021 opinion of [Nurse] Bates recommending that [Plaintiff ] 'avoid activities that exacerbate his symptoms such as standing for long periods of time' partially persuasive (id. (citing Tr. 27, and quoting Tr.

17

727)), "but fail[ing] to include any limitations in the RFC for the duration of standing and/or walking that [Plaintiff] was capable of performing" (id. (referencing Tr. 21-22)).

Plaintiff's arguments gloss over the fact that the ALJ expressly recognized that "[Plaintiff] was given a new prescription for longer crutches on December 2, 2020"; however, the ALJ explained that (1) the record did not contain Plaintiff's "original prescription" for crutches, (2) the December 2020 "new" crutches prescription constituted "the only instance that crutch(es) ha[d] been mentioned at treatment visits since the alleged onset date," (3) "[Plaintiff] ha[d] not reported the use of crutches to a treatment provider nor ha[d] he been observed as using them at a treatment visit," and (4) "[Plaintiff] once had an antalgic gait in January 2020, but he ambulated without assistance." (Tr. 23.) The ALJ additionally recognized that Plaintiff's former employer submitted a statement which "noted that [Plaintiff] had a very bad gout flare-up, which made him unable to walk without the aid of crutches for several months" (Tr. 27), but found the statement "not entirely consistent with the overall record that shows generally benign exams and conservative treatment" (Tr. 28).[6]   Regarding

---

[6] Although not expressly mentioned by the ALJ, Plaintiff's former employer represented Plaintiff's dates of employment as "from November 29, 2016 until July 4, 2019" and advised that "[a] very bad gout flare up had [Plaintiff] unable to walk without the aid of crutches for several months during which time we came to the agreement that [he] could no longer effectively perform the duties necessary." (Tr. 308 (emphasis added).)  Those statements make clear that Plaintiff's "very bad gout flare" which necessitated crutches must have occurred during the time period preceding July 4, 2019, which predates Plaintiff's alleged
(continued...)

Nurse Bates' opinion that Plaintiff "avoid activities that exacerbate his symptoms such as standing for long periods of time" (Tr. 727), the ALJ explained that he found that opinion only "partially persuasive because[, although] it [wa]s supported by her direct contact with [Plaintiff] and an objective exam that revealed mild edema in the left peronis brevis, [Plaintiff] also reported that he played basketball in the past week, which increased his pain episode," and that "th[e] episode was of <u>limited duration</u> and [Plaintiff] later noted that the intermittent leg pain had <u>resolved</u>" (Tr. 27 (emphasis added) (internal parenthetical citations omitted) (citing Tr. 722, 725, 727, 797)).

Third, Plaintiff "also takes issue with the ALJ's . . . dismiss[al of Plaintiff]'s allegations, in part, based on [his] 'independence in activities of daily living,' and his ability to 'drive, play basketball, mow his yard and play with his children.'" (Docket Entry 12 at 11 (quoting Tr. 28).) In Plaintiff's view, "the ALJ . . . fail[ed] to consider the extent to which [Plaintiff] actually engaged in the activities that [the ALJ] concluded undermine[d Plaintiff]'s allegations." (<u>Id.</u> (citing <u>Woods</u>, 888 F.3d at 694-95 ("An ALJ may not consider the *type* of activities the claimant can perform without also considering the *extent* to which []he can perform them." (brackets and italics added

⁶ (...continued)
onset date by nearly three months. Thus, the former employer's letter, even if fully credited by the ALJ, would not have compelled the ALJ to include an allowance for crutches in the RFC.

19

to match original)))).)  In that regard, Plaintiff notes that his Disability Reports and Function Report "indicate that [he] no longer performed yardwork" (id. at 12 (citing Tr. 265, 270-71, 286)), as well as that his "[F]unction [R]eport repeatedly reference[d] his ability to perform activities – such as helping care for his school-aged child, do laundry and even perform his personal care activities – as he '[wa]s able' given the frequency and severity of his gout flares" (id. (citing Tr. 268-75)).  That argument fails for three reasons.

First, Plaintiff's reliance on Woods misses the mark.  In holding that "[a]n ALJ cannot consider the *type* of activities a claimant can perform without also considering the *extent* to which []he can perform them," Woods, 888 F.3d at 694 (citing Brown v. Commissioner, Soc. Sec. Admin., 873 F.3d 251, 263 (4th Cir. 2017)), Woods underscored the ALJ's failure to recognize qualifications the claimant placed on her ability to perform daily activities, see id. at 694-95 ("[T]he ALJ noted that [the plaintiff] can maintain her personal hygiene, cook, perform light household chores, shop, socialize with family members, and attend church services on a regular basis.  But the ALJ did not consider [the plaintiff]'s statements that she cannot button her clothes, has trouble drying herself after bathing, and sometimes needs help holding a hairdryer; that she can prepare simple meals but has trouble cutting, chopping, dicing, and holding silverware or cups; it takes

20

her all day to do laundry; she shops only for necessities, and that process takes longer than normal; when she reads to her grandchildren, they have to turn the pages because of severe pain in her hands; and that some days, she spends the entire day on the couch."); Brown, 873 F.3d at 263 ("The ALJ did not acknowledge the extent of th[e daily] activities as described by [the plaintiff], e.g., that he simply prepared meals in his microwave, could drive only short distances without significant discomfort, only occasionally did laundry and looked at coins, and . . . had discontinued regular attendance at church and limited his shopping to just thirty minutes once a week."). In contrast, Plaintiff here did not place qualifications on his ability to drive (see Tr. 52-68 (7/17/21 hearing testimony), 260-67 (6/24/20 Disability Report - Appeal), 271 (7/27/20 Function Report), 282-88 (10/27/20 Disability Report-Appeal)), and entirely failed to mention basketball as a hobby/interest or social activity he enjoyed, let alone place qualifications on his ability to play basketball (see Tr. 52-68 (7/17/21 hearing testimony), 272 (7/27/20 Function Report)). Plaintiff cannot fault the ALJ for failing to consider qualifications that Plaintiff did not identify.

Second, although Plaintiff made ambiguous statements about his ability to care for his son (see Tr. 269 (7/27/20 Function Report indicating that Plaintiff "[h]elp[ed] his son get ready for school when able, pack[ed] his lunch, [and] t[ook] him to the park," while

21

also stating that Plaintiff "d[id] things that [he could], but [he] ha[d] no child care, so [he] need[ed] to take care of hi[s son]" (emphasis added))) and denied performing yardwork (see Tr. 265 (6/24/20 Disability Report - Appeal), 271 (7/27/20 Function Report), 286 (10/27/20 Disability Report - Appeal)), the record contains other, competing descriptions of Plaintiff's abilities to engage in such activities (see Tr. 402 (1/22/20 PCP treatment containing Plaintiff's report that he "jarred his back" when "playing with [his] son"), 414 (4/1/20 telephonic visit with PCP provider recording that Plaintiff had "mowed the yard" two days prior "but did not feel any pain after[wards]" (emphasis added)), 557 (1/20/20 ER visit reporting Plaintiff's complaint of back pain after "wrestling around with his son" the night before)).[7] Plaintiff has not provided the Court with any basis to disturb the ALJ's crediting of evidence reflecting a greater ability to engage in such activities. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) ("Ultimately, it is the duty of the [ALJ] reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence.").

---

[7] The record contains many other examples of Plaintiff engaging in physical activities. (See Tr. 370 (7/31/19 PCP visit reflecting that Plaintiff had engaged in "lots of walking and climbing ladders at the pool" the day before), 377 (9/16/19 visit with PCP indicating Plaintiff injured left shoulder "while doing shoulder presses"), 403 (3/13/20 PCP record noting Plaintiff's report that he exercised three to five times per week), 575 (7/21/20 PCP note showing Plaintiff's complaint of chest pain after "washing cars" the day before), 598 (9/16/20 ER visit with reports of chest and shoulder pain following "lifting boxes of pork" the day prior)).

Third, the ALJ did not rely solely on Plaintiff's daily activities to discount his subjective symptom reports, but rather as one part of the ALJ's overall analysis. (See Tr. 23-28.) Plaintiff's ability to engage in such activities, even on a limited basis, provides some support, along with the medical and opinion evidence discussed by the ALJ, for the ALJ's conclusion that Plaintiff's gout did not prevent him from performing a limited range of light work with manipulative, postural, and environmental restrictions (see Tr. 21-22).

Moreover, by pointing to record evidence Plaintiff believes supports greater limitations in the RFC, he misinterprets this Court's standard of review. The Court must determine whether substantial evidence, i.e., "more than a mere scintilla of evidence but . . . somewhat less than a preponderance," Mastro, 270 F.3d at 176 (brackets and internal quotation marks omitted), supported the ALJ's RFC findings, and not whether other record evidence weighed against those findings, see Lanier v. Colvin, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) (unpublished) ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence.").

Lastly, the evidence relied upon by Plaintiff would not have compelled the ALJ to limit Plaintiff to less than frequent

manipulative movements or to include allowances for crutches and absenteeism in the RFC. (See Docket Entry 12 at 6-7 (citing Tr. 226, 308, 385, 405, 408, 412-13, 418, 420, 423-24, 565, 612, 722, 737).) Transcript pages 226 and 308 contain duplicate copies of the statement from Plaintiff's former employer which, as discussed above, the ALJ discounted (see Tr. 28), and which showed (at most) that Plaintiff experienced a gout flare and used crutches at some unidentified time predating his alleged onset date. Other portions of that evidence reflect routine follow-up visits not involving complaints of an active gout flare (see Tr. 385 (11/26/19 PCP visit for primary complaint of dizziness also reflecting Plaintiff's subjective report of gout flares every two to three weeks, with objective findings of normal strength, tone, posture, range of motion, sensation, reflexes, and pulses with no swelling or crepitus), 403-05 (3/13/20 blood pressure check with PCP who advised Plaintiff to call office for steroid taper if he had gout flare), 410-13 (1/24/20 labs follow-up visit with PCP reflecting "no current issues" with gout (emphasis added)), 416-19 (6/24/20 labs follow-up appointment with PCP reflecting no specific gout complaints, uric acid at appropriate level, and entirely normal physical exam), 420-22 (6/1/20 PCP visit containing Plaintiff's request for "documentation of his disability," because he "fe[lt] he [wa]s not able to work due to chronic pain from gout," with completely normal objective findings)), or treatment for conditions

24

that providers <u>did not diagnose as gout</u> (<u>see</u> Tr. 423-24 (4/27/20 PCP treatment for "'gout pain' in [left] foot [for] 3 days" but diagnosing possible <u>plantar fasciitis</u>), 612 (12/2/20 PCP note for "yearly routine physical" with complaint of "intermittent pain in [right] foot [for] 1 week" resulting in diagnosis of suspected <u>heel spur</u>), 722-27 (4/27/21 PCP visit for increased left ankle pain after playing basketball, with objective findings of "<u>mild</u> edema" but "[n]o[] tender[ness] to touch" in left peronis brevis tendon, and resulting in diagnosis of "[l]eft ankle pain" (emphasis added)), 737 (5/3/21 orthopedic treatment for same lower left leg pain, with objective findings of "tightness" but <u>no</u> tenderness, and reflecting diagnosis of "[p]ain in left leg" (emphasis added))).

The remaining two pieces of evidence relied upon by Plaintiff reflect his treatment in the ER and in follow-up with his PCP <u>on the same day</u> for gout in his left knee. (<u>See</u> Tr. 407-08 (2/5/20 post-ER follow-up visit to PCP with objective findings of elevated uric acid, as well as tenderness, swelling, and tophi in left knee), 564-68 (2/5/20 ER visit for complaint of left knee gout with objective findings of "<u>mild</u> generalized edema and generalized [tenderness to palpation]" and x-ray findings of "<u>slight</u> narrowing medially" and "<u>no</u> erosive changes or intra-articular calcification" (emphasis added)).) That evidence of a <u>single</u> gout flare in Plaintiff's <u>knee</u> supports the ALJ's finding that Plaintiff's gout constituted a severe impairment at step two of the SEP (<u>see</u> Tr.

18), but simply would not have compelled the ALJ to adopt greater <u>manipulative</u> limitations or to include allowances for crutches and absenteeism in the RFC.

In light of the foregoing analysis, Plaintiff's first and only assignment of error falls short.

### III.  CONCLUSION

Plaintiff has not established an error warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Summary Judgment (Docket Entry 11) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 13) be granted, and that this action be dismissed with prejudice.


/s/ L. Patrick Auld<br>
<b>L. Patrick Auld</b><br>
<b>United States Magistrate Judge</b>

February 13, 2023